**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DARRELL CANNON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05 C 2192 |
| | ) | |
| JON BURGE, et al. | ) | The Honorable Amy J. St. Eve |
| | ) | |
| Defendants. | ) | JURY DEMAND |

**DEFENDANT JON BURGE'S ANSWER TO
PLAINTIFF'S  FIRST AMENDED COMPLAINT**

Defendant Jon Burge ("Defendant") answers Plaintiff's First Amended Complaint as follows:

**I.      INTRODUCTION**

1.      This is a civil rights action brought pursuant to 42 U.S.C. § 1983 et seq.; the Judicial Code, 28 U.S.C. §§ 1331 and 1343(a); the Constitution of the United States; and pendent jurisdiction, as codified in 28 U.S.C. § 1367(a).

**ANSWER:**      Defendant admits Plaintiff has brought this action pursuant to the manner stated but denies Plaintiff is entitled to any relief in this matter.

2.      This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1331.  Venue is proper under 28 U.S.C. § 1391(b).  The parties reside, or, at the time the events took place, formerly resided in this judicial district, and the events giving rise to the claims asserted herein occurred here as well.

**ANSWER:**      Defendant admits Plaintiff seeks to invoke the jurisdiction of the Court in the manner stated, that venue is proper, and that the parties reside, or at the time the events allegedly took place, formerly resided in this judicial district.  With respect to the remaining averments in paragraph 2 of Plaintiff's First Amended Complaint, Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth

Amendment of the United States Constitution, and therefore declines to answer at this time.

## II.   PARTIES

3.   Plaintiff Darrell Cannon is an African-American man, and a citizen of the United States.

**ANSWER:**   Defendant admits the averments contained in paragraph 3 of Plaintiff's First Amended Complaint.

4.   Defendant Jon Burge was a duly appointed and sworn Chicago Police Lieutenant and the commanding officer of Chicago Police Area 2 Detective Violent Crimes Unit.  Burge was the commanding officer of Defendants John Byrne, Peter Dignan, Charles Grunhard, Michael Bosco, Ray Binkowski, Ray Madigan, and Daniel McWeeny; engaged in the conduct complained of in the course and scope of his employment; and is sued in his individual capacity. Defendant Burge engaged in a pattern and practice of torture and brutality himself, and also supervised, encouraged, sanctioned, condoned and ratified brutality and torture by other detectives, including, but not limited to, the police officer Defendants named herein.  In 1988, Burge was promoted to Commander of Area 3 Detective Division by Defendant Martin and held this assignment until 1991, when he was suspended and, ultimately, fired by the Chicago Police Department for the torture and abuse of Andrew Wilson.

**ANSWER:**   Defendant admits Plaintiff has sued Jon Burge in his individual capacity.  With respect to the remaining averments in paragraph 4 of Plaintiff's First Amended Complaint, Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

5.   Defendant John Byrne was a duly appointed and sworn Chicago Police Sergeant in the Chicago Police Area 2 Detective Violent Crimes Unit.  Byrne was the supervisor of

2

Defendants Peter Dignan, Charles Grunhard, Michael Bosco, Ray Binkowski, Raymond

Madigan, and Daniel McWeeny; engaged in the conduct complained of in the course and scope

of his employment; and is sued in his individual capacity. Defendant Byrne, like Defendant

Burge, engaged in a pattern and practice of torture and brutality himself, and also supervised,

encouraged, sanctioned, condoned and ratified brutality and torture by other detectives,

including, but not limited to, the police officer Defendants named herein.

**ANSWER:** Defendant admits Plaintiff has sued John Byrne in his individual capacity. With respect to the remaining averments in paragraph 5 of Plaintiff's First Amended Complaint, Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

6. Defendants Peter Dignan, Charles Grunhard, Michael Bosco, Ray Madigan, and

Daniel McWeeny (referred to herein collectively, with Defendants Burge and Byrne, as "the

Defendant Officers") were duly appointed and sworn Chicago Police detectives who were

assigned to the Detective Division at Area 2 Violent Crimes Unit under Defendant Burge's

command; engaged in a pattern and practice of torture and brutality themselves; and engaged in

the conduct complained of in the course and scope of their employment. The Defendant Officers

are sued in their individual capacities.

**ANSWER:** Defendant admits Plaintiff has sued Defendants Peter Dignan, Charles Grunhard, Michael Bosco, Ray Madigan and Daniel McWeeny in their individual capacities. With respect to the remaining averments in paragraph 6 of Plaintiff's First Amended Complaint, Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

7. From 1987 to 1992, Defendant Leroy Martin was the Superintendent of Police for

the City of Chicago, and as such was responsible for the policies, practices, and customs

3

complained of herein.  In 1983, he was Commander of the Area 2 Detective Division and was

thereby Defendant Burge's direct supervisor, as well as the command supervisor of Defendant

Byrne, and the other Defendant officers.  He engaged in the conduct complained of in the course

and scope of his employment and is sued in his individual capacity.

**ANSWER:** Defendant admits Leroy Martin was the former Superintendent of Police for the City of Chicago and Plaintiff has sued Leroy Martin in his individual capacity. With respect to the remaining averments in paragraph 7 of Plaintiff's First Amended Complaint, Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

8. From 1998 to 2004, Defendant Terry Hillard was the Superintendent of Police for

the City of Chicago, and as such was responsible for the policies, practices, and customs

complained of herein.  He engaged in the conduct complained of in the course and scope of his

employment and is sued in his individual capacity.

**ANSWER:** Defendant admits Terry Hillard was the former Superintendent of Police for the City of Chicago and Plaintiff has sued Terry Hillard in his individual capacity. With respect to the remaining averments in paragraph 8 of Plaintiff's First Amended Complaint, Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

9. From 1998 to 2002, Defendant Thomas Needham was counsel to, and

administrative assistant for, Superintendent Terry Hillard, who was his direct supervisor.  He

engaged in the conduct complained of in the course and scope of his employment and is sued in

his individual capacity.

**ANSWER:** Defendant admits Thomas Needham is sued in his individual capacity.  With respect to the remaining averments in paragraph 9 of Plaintiff's First Amended Complaint, Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth

4

Amendment of the United States Constitution, and therefore declines to answer at this time.

10.     From 1990 to 1998, Defendant Gayle Shines was the Director of the Office of Professional Standards of the Chicago Police Department.  Her direct supervisor was the Chicago Police Superintendent.  She engaged in the conduct complained of in the course and scope of her employment and is sued in her individual capacity.

**ANSWER:**     Defendant admits Gayle Shines is sued in her individual capacity.  With respect to the remaining averments in paragraph 10 of Plaintiff's First Amended Complaint, Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

11.     Defendant City of Chicago is an Illinois municipal corporation, and as such is responsible for the policies, practices and customs of the Chicago Police Department, its Office of Professional Standards, its Personnel Division, its Detective Division, and its Superintendent of Police, as well as those of the Mayor and his office, the Corporation Counsel and her Office, and the Chicago Police Board.  The City of Chicago is and/or was the employer of each of the Defendant Officers and Police officials.  The City of Chicago is responsible for the acts of the Defendant Officers and police officials while employed by the City of Chicago and while acting within the scope of their employment.

**ANSWER:**     Defendant admits City of Chicago is a municipal entity.  With respect to the remaining averments in paragraph 11 of Plaintiff's First Amended Complaint, Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

12.     Defendant Richard Devine has been the State's Attorney of Cook County from 1997 to the present, and as such is responsible for the policies, practices and customs of the

State's Attorneys' Office. He engaged in the conduct complained of in the course and scope of his employment and is sued in his individual capacity.

**ANSWER:** Defendant admits Richard Devine was the State's Attorney of Cook County from 1996 until 2008 and he is sued in his individual capacity. With respect to the remaining averments in paragraph 12 of Plaintiff's First Amended Complaint, Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

13. Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of its Cook County State's Attorney's Office (hereinafter referred to as the "SAO"). At all times relevant to this action, Cook County and the Cook County State's Attorney's Office were the employers of Defendant Devine, and Cook County is a necessary party to this lawsuit.

**ANSWER:** Defendant is without knowledge or information sufficient to admit or deny Plaintiff's averments contained in paragraph 13 of Plaintiff's First Amended Complaint.

14. At all times relevant to this action, each of the named defendants acted in the scope of employment, and under the color of laws, regulations, and customs of the State of Illinois. Each defendant's actions constituted "state action" as defined under federal law.

**ANSWER:** Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

## III.    FACTUAL ALLEGATIONS

15. On or about October 26, 1983, Darrin Ross was shot and killed by A.D. McChristian in A.D.'s car, and the Area 2 Violent Crimes Unit, under the direct supervision and

control of Defendants Burge and Byrne, and with the participation of Defendants Dignan, Grunhard, Bosco, Binkowski, Madigan, and McWeeny, commenced an investigation into his homicide.

**ANSWER:** Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

16. In pursuit of this investigation, Defendants McWeeny and Madigan, at the direction and under the supervision of Defendant Burge and Byrne, threatened and coerced A.D. McChristian's brother, Tyrone McChristian, to falsely implicate Plaintiff as a possible accomplice in the homicide.

**ANSWER:** Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

17. Despite the fact that the Defendant Officers knew that Tyrone McChristian's statement was false and coerced, Defendant McWeeny reduced this statement to an official police report. McChristian has subsequently recanted his statement.

**ANSWER:** Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

18. In the early morning hours of November 2, 1983, Defendants Byrne, Dignan, Bosco and Binkowski, together with co-conspirator Area 2 detectives Edmund Leracz, Donald Degmon, and Francis Gitrich, went to an apartment on the south side of Chicago and arrested the Plaintiff without probable cause.

**ANSWER:** Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth

Amendment of the United States Constitution, and therefore declines to answer at this time.

19. During the arrest, Defendant Byrne called Plaintiff's fiancé a "bitch" and a "motherfucker," Defendants Byrne and Dignan pointed guns at her head; Defendant Dignan called Plaintiff a "nigger," placed a shotgun to Plaintiff's head and threatened to blow his head off; and Defendant Grunhard assaulted Plaintiff with a crowbar.

**ANSWER:** Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

20. Plaintiff was then placed in a detective car with Defendants Dignan, Byrne and Grunhard and transported to the area of 80th and Phillips Streets. During the ride, Defendant Dignan said, "nigger, where's A..D[sic.].;" told Plaintiff that they had "scientific ways" of getting him to talk, and that he was in for "the hardest day of his life;" and hit Plaintiff on the knee with his flashlight.

**ANSWER:** Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

21. Plaintiff was then taken to Area 2, placed in an interrogation room and interrogated about the Ross homicide by Defendants McWeeny and Grunhard. During this interrogation, McWeeny and Grunhard suggested inculpatory answers. Defendant Bosco entered the room with an electrical cattle prod in a bag, showed it to Plaintiff, said "nigger, you going to tell us where A.D.'s at;" Bosco then pointed the cattle prod at Plaintiff and said that he would "talk before the day was over."

**ANSWER:** Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth

Amendment of the United States Constitution, and therefore declines to answer at this time.

22.     Plaintiff was then transported through a viaduct or tunnel to a remote area near a body of water in the vicinity of 103rd and Torrence Streets by Defendants Byrne, Dignan and Grunhard.  They were followed in another police car by Defendants Bosco and Binkowski, who blocked the entrance to the viaduct with their police vehicle.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

23.     Defendants Byrne, Dignan and Grunhard then took Plaintiff out of the car, questioned him about the Ross homicide and the whereabouts of A.D. McChristian.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

24.     When Plaintiff refused to answer, the Defendants performed a mock execution. After appearing to place a shell in his shotgun, Dignan placed the shotgun in Plaintiff's mouth, and said "nigger, where's A.D.?"  After Plaintiff did not reply, Grunhard said "shoot him," and Dignan pulled the trigger, causing the gun to click rather than discharge.  They then repeated this mock execution two more times.


**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

25.     Defendants Byrne, Dignan and Grunhard then attempted to suspend Plaintiff, who was handcuffed behind his back, in the air by his handcuffs, while they questioned him and called him "nigger."

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

26.     Defendant Byrne then forced Plaintiff at gunpoint into the back seat of the police vehicle, and, while Plaintiff lay there handcuffed, Byrne pulled down Plaintiff's pants, again called him "nigger" and questioned him about the murder and the whereabouts of A.D.  When Plaintiff again refused to cooperate, Byrne electric shocked him on the testicles and penis with the cattle prod.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

27.     Byrne repeated the shocking over and over while Dignan restrained Plaintiff's feet, and they continued to interrogate Plaintiff about A.D.'s location and the Ross homicide.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

28.     Finally, after Byrne called Plaintiff a "strong nigger," threatened to turn the cattle prod on "high," and shocked Plaintiff again, Plaintiff finally broke, agreed to say anything the Defendants wanted him to say, and answered their questions with information that they had previously supplied him during their questioning.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth

Amendment of the United States Constitution, and therefore declines to answer at
this time.

29.     Defendants Byrne, Dignan and Grunhard then transported Plaintiff to the auto

pound in an attempt to obtain his identification of A.D.'s car and to further question Plaintiff

about the homicide.  Again, Defendants Bosco and Binkowski followed in their police auto.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal
                prosecution, reluctantly asserts the rights guaranteed to him by the Fifth
                Amendment of the United States Constitution, and therefore declines to answer at
                this time.

30.     En route to the pound, Plaintiff was threatened with the cattle prod, so he

described A.D.'s car.  At the pound, Plaintiff refused to answer further questions, and after

Defendants Byrne, Dignan and Grunhard forced him back into the police car, Byrne again

shocked him on the testicles while Dignan held his hand over Plaintiff's mouth to keep him from

screaming out.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal
                prosecution, reluctantly asserts the rights guaranteed to him by the Fifth
                Amendment of the United States Constitution, and therefore declines to answer at
                this time.

31.     Plaintiff then gave a false and coerced statement to Defendant McWeeny,

repeating the information previously supplied to him by Defendants Byrne, Dignan, Grunhard

and McWeeny, and thereby falsely implicating himself as an accomplice to A.D. McChristian.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal
                prosecution, reluctantly asserts the rights guaranteed to him by the Fifth
                Amendment of the United States Constitution, and therefore declines to answer at
                this time.

32.     Plaintiff then repeated this false and coerced statement to assistant state's attorney

Henry Simmons, in the presence of Defendant McWeeny, at Area 2.

11

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

33.     The interrogation and torture of Plaintiff in pursuit of a confession which was constructed by the Defendant torturers and interrogators and fed to him after he was broken, was part of a long-standing pattern and practice of similar acts of racially motivated torture, including electric shock, mock executions and Russian roulette, suspensions, and baggings under the supervision, and with the encouragement, participation and ratification of Defendant Burge. Burge was present at Area 2 as the commanding officer of the Defendants on November 2, 1983, was in charge of the Ross homicide investigation and the interrogation of the Plaintiff; and thereby supervised, encouraged, participated in, failed to prevent, and ratified the actions of the Defendants herein, as alleged more specifically above, as part of said pattern and practice.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

34.     Additionally, Defendant Martin, as Commander of Area 2 on November 2, 1983, was Burge's direct supervisor, was, on information and belief, present at Area 2 on November 2, 1983; was aware of the pattern and practice of torture at Area 2, which included at least six other cases of torture from September of 1983 through November of 1983; and thereby encouraged, approved, failed to prevent, and/or ratified Plaintiff's torture and false and constructed confession.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

35.     Plaintiff's false admissions, which were coerced, constructed and manufactured by the Defendant Officers, were memorialized in false official reports, and presented to prosecuting attorneys who relied upon and presented this false, coerced and manufactured evidence throughout Plaintiff's prosecution.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

36.     Defendants Byrne, Dignan, Grunhard, Bosco, Binkowski, McWeeny, and conspirators Gitrich and Simmons also presented this fabricated, coerced and totally unreliable evidence at Plaintiff's motion to suppress hearings and trials through false and perjured testimony.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

37.     Defendants Burge, Byrne, Dignan, Grunhard, McWeeny, Bosco, Binkowski and Martin, together with their co-conspirators, also suppressed from the prosecutors who prosecuted Plaintiff, from the judges and juries who heard his case, and from the prosecutors and judges who prosecuted and heard Plaintiff's appeals and motions to suppress, that the admissions they attributed to Plaintiff were false and totally unreliable, coerced through torture, constructed and manufactured by them, and were a product of a pattern and practice of torture and abuse at Area 2 which they commanded, supervised and implemented; additionally they suppressed, committed perjury about, and destroyed the physical implements of this pattern and practice of torture, including the cattle prod and shotgun used against Plaintiff, and the electric shock box, plastic

13

bags, typewriter covers, and handguns used by them against numerous other victims of their

pattern and practice of torture.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal
prosecution, reluctantly asserts the rights guaranteed to him by the Fifth
Amendment of the United States Constitution, and therefore declines to answer at
this time.

38.     On November 7, 1983, the Office of Professional Standards of the Chicago Police

Department ("the OPS") opened an "investigation" into Plaintiff's allegations of torture.  The

complaint was forwarded to Commander Martin.  Neither Martin nor the OPS took any

disciplinary action against any of the Defendant Officers, and nearly a year later, the OPS

entered "not sustained" findings.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal
prosecution, reluctantly asserts the rights guaranteed to him by the Fifth
Amendment of the United States Constitution, and therefore declines to answer at
this time.

39.     Prior to Plaintiff's criminal trial in 1984, the trial judge, relying on the police

Defendants' and their co-conspirators' false and perjured testimony denying torture, denied

Plaintiff's motion to suppress his coerced statement; this coerced and fabricated "confession"

was presented by the prosecution as the only evidence against him at the 1984 trial and provided

the basis for his conviction on an accountability theory for the murder of Darrin Ross.  Absent

the Defendants' coercion, torture and fabrication, Plaintiff would neither have been prosecuted

for, nor convicted of, a crime he did not commit.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal
prosecution, reluctantly asserts the rights guaranteed to him by the Fifth
Amendment of the United States Constitution, and therefore declines to answer at
this time.

40.     In November of 1984 and February of 1985, OPS Director David Fogel, secretly provided summaries of numerous OPS cases of electric shock torture, including those of Plaintiff and Andrew Wilson, who was electric shocked, bagged and otherwise tortured by Defendant Burge, to Police Superintendent Fred Rice, who took no action. Rice, Fogel, and successive Superintendents and OPS Directors, including Defendants Martin and Shines, and the Defendant City and its lawyers, suppressed these summaries and most of the files themselves from the Plaintiff and all other criminal and civil litigants until they were discovered in boxes produced for inspection by the City in August of 2004.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

41.     In 1987, Plaintiff filed a 42 U.S.C. § 1983 action alleging excessive use of force by Defendants Byrne, Dignan, and Grunhard for their torture and abuse on November 2, 1983. Solely and exclusively because the Defendants successfully suppressed, destroyed, and covered up their torture of Plaintiff, numerous other cases of torture, and the implements of torture, Plaintiff accepted a nuisance value settlement of $3000, a tiny fraction of what the claim was truly worth.

**ANSWER:**     Defendant admits Plaintiff filed a 42 U.S.C. § 1983 action in 1987 alleging excessive use of force by Defendants Byrne, Dignan and Grunhard for acts that allegedly took place on November 2, 1983. Defendant further admits Plaintiff accepted $3,000.00 as a final and total settlement of all claims he had at the time of judgment or may have in the future, arising either directly or indirectly out of the incident which was the basis of the litigation. With respect to the remaining averments in paragraph 41 of Plaintiff's First Amended Complaint, Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

15

42.     In 1990, after Plaintiff was convicted, and after the Plaintiff accepted the settlement, the OPS completed an investigation into allegations of torture of suspects, including Plaintiff, at Area 2.  In a secret report which was approved by the Director of the OPS and forwarded to Defendant Superintendent Leroy Martin, the OPS found that from1973 to 1985 there was a practice of systematic abuse of suspects held in custody at Area 2, including Plaintiff, and that certain Area 2 command personnel were aware of such abuse and condoned it. The OPS further found that this practice included psychological techniques and planned torture, and that Area 2 command personnel were aware of the systematic abuse and encouraged it either by actively participating in it or by failing to take any action to stop it.  Command personnel at Area 2 during part or all of that time included Defendants Burge and Martin.  This report also collected, identified, and detailed numerous cases of torture and abuse at Area 2.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

43.     In another section of this Report, the OPS also found that Burge and two other Area 2 detectives tortured Andrew Wilson, *inter alia*, with electric shock, and recommended that Burge and two of his men be fired.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

44.     Defendant Superintendent Martin and other command personnel delayed, obstructed, and otherwise undermined the OPS investigation, report, findings and conclusions set forth above, *inter alia*, by suppressing the findings that Wilson was tortured and by refusing to

suspend, transfer or remove Burge either before, or for nearly a year after, the findings of the

OPS were first made known to them in November of 1990.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

45.     Defendant Martin and other command personnel further delayed, obstructed, and

otherwise undermined the OPS investigation, report, findings and conclusions set forth above,

*inter alia*, by suppressing the findings that there was systematic abuse at Area 2, which

implicated Defendants Martin, Burge, the Officer Defendants, and other Area 2 detectives.  This

suppression prevented Plaintiff from obtaining highly exculpatory evidence for use in his

criminal proceedings and in civil litigation.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

46.     This report and its findings were ordered publicly released by Federal Court order

in February of 1992, and Defendant Martin, together with Mayor Richard M. Daley, publicly

attempted to discredit and undermine the report and its findings as "unsubstantiated rumors," and

did not discipline Defendants Byrne, Dignan, and Grunhard for their role in this pattern and

practice of torture, or otherwise act to implement the Report's findings.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

47.     As States Attorney of Cook County from 1981 through 1988, Richard M. Daley

had specific notice of a pattern and practice of torture and abuse at Area 2 by Burge, Byrne,

Dignan, and others, (including Plaintiff's and more than 50 other cases) and refused to prosecute

Burge, Byrne, Dignan or any other Area 2 detective, despite being presented with specific

evidence of torture by Police Superintendent Richard Brzeczek well before Plaintiff was

tortured.

**ANSWER:** Defendant admits that Richard M. Daley was State's Attorney of Cook County
from 1981 through 1988.  With respect to the remaining averments in paragraph
47 of Plaintiff's First Amended Complaint, Defendant, on the advice of counsel
due to the threat of a potential criminal prosecution, reluctantly asserts the rights
guaranteed to him by the Fifth Amendment of the United States Constitution, and
therefore declines to answer at this time.

48.     Additionally, Defendant Martin, Defendant OPS Director Shines, and other

command personnel, in violation of police regulations, refused to investigate numerous other

allegations of police torture which were brought to their attention, including allegations of

electric shock and abuse made by electric shock victim Melvin Jones against Defendants Burge,

and McWeeny, despite the findings made in the Goldston Report, and other specific requests to

do so.

**ANSWER:** Defendant, on the advice of counsel due to the threat of a potential criminal
prosecution, reluctantly asserts the rights guaranteed to him by the Fifth
Amendment of the United States Constitution, and therefore declines to answer at
this time.

49.     In January of 1992, Defendant Martin and the City judicially admitted before the

Police Board that Burge and others under his command engaged in an "astounding pattern and

plan" of torture, particularly including the use of electric shock.

**ANSWER:** Defendant, on the advice of counsel due to the threat of a potential criminal
prosecution, reluctantly asserts the rights guaranteed to him by the Fifth
Amendment of the United States Constitution, and therefore declines to answer at
this time.

50. In February of 1993, the Chicago Police Board fired Jon Burge for torturing Andrew Wilson, *inter alia*, with electric shock. These findings became final in December of 1995.

**ANSWER:** Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

51. In September of 1988, Defendant Devine, together with law partner William Kunkle, and their law firm, were retained by the Defendant City of Chicago to represent Defendant Jon Burge and several Area 2 detectives, including John Yucaitis and Patrick O'Hara, in the civil rights lawsuit brought against them and the City of Chicago by Area 2 torture victim Andrew Wilson.

**ANSWER:** Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

52. For the next eight years, Defendant Devine, Mr. Kunkle, and their law firm continued to represent Defendant Burge, John Yucaitis, Patrick O'Hara and the other Area 2 defendants in the *Wilson* civil cases, as well as in the Police Board Proceedings against Burge, Yucaitis and O'Hara, having been retained by the Fraternal Order of Police (FOP). Additionally, Defendant Devine, Mr. Kunkle and their law firm were retained by the Defendant City of Chicago to represent Defendants Burge, Byrne and Dignan in several other civil rights torture cases where a pattern and practice of torture was alleged. As a result of this representation, Defendant Devine, Mr. Kunkle and their law firm received over one million dollars in attorney's fees from the City of Chicago and the FOP.

19

**ANSWER:**   Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

53.    From 1988 to 1996, Defendant Devine, Mr. Kunkle, and their law firm were informed of a wealth of compelling evidence that their clients, including Burge, Byrne and Dignan, were centrally involved in a pattern and practice of torturing suspects, including Plaintiff, at Area 2, and Devine, Kunkle, and their co-counsel, together with Defendants Burge, Byrne, Dignan, and Area 2 detectives Yucaitis and O'Hara, made numerous litigation decisions designed to protect Burge, Yucaitis, and O'Hara from criminal, civil and administrative liability in the face of that evidence.

**ANSWER:**   Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

54.    In 1997, Defendant Devine became the State's Attorney of Cook County.  Acting with a clear conflict of interest and acting under the color of his authority of State's Attorney, Defendant Devine has continued, from 1997 to the present, to protect the interests of his Area 2 clients, particularly Defendant Burge, and to cover up their central role in the pattern and practice of torture, *inter alia*, by:

a.    making false public statements in which he discredited evidence of torture committed by his clients and other Area 2 Defendants, including evidence presented by Plaintiff and other Area 2 victims, whereby they sought suppression of their confessions, new suppression hearings, new trials, new sentences, pardons and/or clemency on the basis that false confessions were tortured from them;

b.    making false statements to public officials in which he discredited the evidence of torture committed by his clients and other Area 2 Defendants;

c.    refusing to investigate the allegations that his clients and other Area 2 and Area 3 detectives were central actors in a pattern and practice of torture and abuse which included the torture of Plaintiff, and obstructing all attempts to so investigate;

d.    suppressing evidence that further established that his clients, and other Area 2 and Area 3 detectives were central actors in the pattern and practice of torture which included Plaintiff's torture; and

e.    otherwise using his influence and decision-making power as State's Attorney of Cook County to continue the wrongful conviction and imprisonment of Plaintiff and other torture victims.

**ANSWER:**    Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

55.    In 1993, the OPS reopened investigations into approximately 10 Area 2 torture cases, including Plaintiff's. After an exhaustive re-investigation, which uncovered substantial new evidence in support of the allegations, the OPS investigator sustained numerous allegations that Byrne, Dignan and Grunhard racially abused and tortured Plaintiff with the cattle prod at the torture site, and at the auto pound, and subjected him to a mock execution and suspension by his handcuffs.

**ANSWER:**    Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

56.     The OPS also entered sustained findings of torture and abuse against Byrne and

Dignan in five other re-opened cases, including that of death row inmate Stanley Howard.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal
prosecution, reluctantly asserts the rights guaranteed to him by the Fifth
Amendment of the United States Constitution, and therefore declines to answer at
this time.

57.     From 1993 until 1998, when she left office, Defendant OPS Director Gayle

Shines suppressed these findings and the evidence which supported them by secreting the files in

her personal office.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal
prosecution, reluctantly asserts the rights guaranteed to him by the Fifth
Amendment of the United States Constitution, and therefore declines to answer at
this time.

58.     In 1998, Defendants Hillard and Needham, with full knowledge that Defendants

Burge, Byrne and Dignan, the other Defendant Officers, and other Area 2 and Area 3 detectives

participated in a pattern and practice of torture and abuse of suspects, including Plaintiff,

violated police regulations and obstructed justice by overturning the OPS sustained findings in

Plaintiff's and the other five re-opened cases; by refusing to investigate other torture victims'

claims that they had been tortured; by refusing to investigate OPS Director Gayle Shines'

suppression of evidence, and by suppressing these OPS files and findings from Plaintiff and

other criminal defendants.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal
prosecution, reluctantly asserts the rights guaranteed to him by the Fifth
Amendment of the United States Constitution, and therefore declines to answer at
this time.

59.     In 1997, the Illinois Appellate Court ordered that Plaintiff receive a new motion to suppress hearing at which he be permitted to present all the newly discovered evidence of torture and abuse which had been uncovered since his 1984 motion to suppress hearing.

**ANSWER:**     Defendant admits that in 1997, the Illinois Appellate Court remanded Plaintiff's case to the trial court for a new hearing on Plaintiff's motion to suppress his confession as set forth in *People v. Darryl Cannon,* 688 N.E.2d 693 (1st Dist. 1997).  With respect to the remaining averments in paragraph 59 of Plaintiff's First Amended Complaint, Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

60.     At this remand hearing, which commenced in 1999, the Plaintiff presented a wealth of newly discovered evidence of torture and abuse.  The State's Attorney's Office, rather than to again elicit the knowingly false and perjured testimony of the Defendant Officers, dismissed Plaintiff's case on April 14, 2004.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

61.     On January 10, 2003, Illinois Governor George Ryan granted four Illinois death row inmates pardons on the basis of innocense.  In granting Burge death row torture victims Madison Hobley, Aaron Patterson, Leroy Orange, and Stanley Howard innocence pardons, the Governor found that:

> The category of horrors was hard to believe.  If I hadn't reviewed the cases myself, I wouldn't believe it.  We have evidence from four men, who did not know each other, all getting beaten and tortured and convicted on the basis of the confessions they allegedly provided.  They are perfect examples of what is so terribly broken about our system.

**ANSWER:**     Defendant admits that on January 10, 2003, former Illinois Governor George Ryan granted death row inmates Madison Hobley, Aaron Patterson, Leroy Orange and Stanley Howard pardons purportedly on the basis of innocence.  Defendant denies that the statement attributed to Ryan in paragraph 61 of Plaintiff's First

23

Amended Complaint is a complete and accurate quotation from him. With respect to the remaining averments in paragraph 61 of Plaintiff's First Amended Complaint, Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

62. In August and September of 2004, Defendants Burge, Byrne, Dignan, Bosco, McWeeny and Madigan invoked the Fifth Amendment as to all questions concerning the torture of Plaintiff, the coercion, construction and manufacture of Plaintiff's false confession, the coercion of Tyrone McChristian, and the torture of numerous other victims as a part of a pattern and practice of torture and abuse.

**ANSWER:**    Defendant admits that in August and September of 2004 in a consolidated deposition in the cases of *Hobley v. Patterson, Patterson v. Burge, Howard v. Chicago,* and *Orange v. Burge*, Defendants Burge, Byrne and Madigan asserted their Fifth Amendment rights in response to all questions related to their employment with the Chicago Police Department.

Defendant denies that Defendants Bosco, Dignan and McWeeny testified in August and September of 2004.

63. Plaintiff spent twenty one years in prison for a crime he did not commit. This time was emotionally, physically, and psychologically grueling and Plaintiff suffered from constant fear and anxiety, deep depression, despair, rage, boredom and loneliness. Plaintiff suffered from the loss of sustained contact with his children. He continues to live under the effect of his isolation, incarceration, and depression. Additionally, Plaintiff suffered and continues to suffer, egregious pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and post traumatic stress disorder from his torture and abuse.

**ANSWER:**    Defendant admits Plaintiff spent time in prison. Defendant is without knowledge or belief sufficient to admit or deny the averments in Plaintiff's Complaint regarding the time Plaintiff spent in jail and its effect on him. With respect to the remaining averments in paragraph 63 of Plaintiff's First Amended Complaint, Defendant, on the advice of counsel due to the threat of a potential criminal

24

prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

64.     Defendants Burge, Byrne, Dignan, Grunhard, McWeeny, Bosco, Binkowski, Madigan, Martin, Devine, Shines, Hillard, and Needham, acting jointly and with other police and prosecutorial investigative, supervisory, and command personnel, together and under color of law, reached an understanding, engaged in a course of conduct, engaged in a joint action and otherwise conspired among and between themselves to deprive Plaintiff of his constitutional rights, and did deprive Plaintiff of those rights, including his right to be free from unreasonable arrest and seizure, from wrongful confinement and imprisonment, from involuntary incrimination, from interrogation techniques which "shock the conscience," and his right to access to the Courts and to a fair and impartial trial, as protected by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  Because these actions were done with the knowledge and purpose of depriving Plaintiff, who is African-American, of the equal protection of the laws and/or of equal privileges and immunities under the law, and with racial animus toward the Plaintiff, they also deprived Plaintiff of his right to equal protection of the laws under the Fourteenth Amendment, and 42 U.S.C. §§ 1983 and 1985.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

65.     In furtherance of this conspiracy or conspiracies, Defendants Burge, Byrne, Dignan, Grunhard, McWeeny, Bosco, Binkowski, Madigan, Martin, Devine, Shies, Hillard, and Needham, together with their co-conspirators, each committed one or more overt acts set forth above, including, but not limited to: the wrongful arrest, imprisonment, charging and prosecution

25

of Plaintiff and other torture victims; the fabrication and coercion of false and totally unreliable

inculpatory evidence against Plaintiff and other torture victims; the coercion and manufacture of

false and totally unreliable evidence from Plaintiff; the failure to stop the coercive interrogations

of Plaintiff, despite having knowledge that he was being tortured and abused; the

unconstitutional torture and coercion of Plaintiff and other torture victims in order to compel

them to make false inculpatory statements against themselves and/or others; the coercion of a

false statement from Tyrone McChristian; the repeated deception of prosecuting attorneys and

judges, by, *inter alia*, making knowing misstatements and the presentation of this knowingly

false and incomplete evidence to prosecutors and judges; the giving of false testimony and the

filing of false and incomplete statements and reports; the suppression of favorable, exculpatory

evidence; the failure to come forward with a truthful account of the events; the refusal to

investigate and the subversion and quashing of good faith investigations and findings; the abuse

of public office and the exploitation of a blatant conflict of interest to cover-up the acts of torture

and abuse; and the other acts set forth above.

**ANSWER:**   Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

66.   This conspiracy or conspiracies, joint actions and over acts continue to this date.

They have caused and continue to cause Plaintiff's constitutional rights to be violated and the

injuries, pain, suffering, fear, mental anguish, detention, imprisonment, humiliation, and loss of

freedom and companionship, as set forth more fully above and below.

**ANSWER:**   Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

## COUNT I

### (42 U.S.C. § 1983 Claim for Deprivation of Right to Fair Trial and for Wrongful Conviction)

67.     Plaintiff re-alleges paragraphs 1 through 66.

**ANSWER:**     Defendant incorporates as if fully stated herein his responses to paragraphs 1 through 66 of Plaintiff's First Amended Complaint.

68.     Defendants Burge, Burge, [sic] Byrne, Dignan, Grunhard, McWeeny, Bosco, Binkowski, Madigan, and Martin, individually, jointly, and in conspiracy, caused the wrongful charging, prosecution, and conviction of Plaintiff.  These same Defendants, together with Defendants Martin, Devine, Shines, Hillard, and Needham, individually, jointly, and in conspiracy, caused the continuation of that wrongful conviction, by coercing, constructing and/or fabricating the false and totally unreliable statements which formed the basis for Plaintiff's charging, prosecution and conviction; by withholding from the prosecutors, judges and defense attorneys involved in Plaintiff's prosecution the fact that these admissions were false, totally unreliable, constructed, and coerced; by suppressing additional exculpatory and exonerating torture findings and evidence, as well as other exculpatory evidence; by giving a false and incomplete version of events to prosecutors; by writing false reports and giving false testimony; by improperly influencing the judges hearing Plaintiff's case, *inter alia*, by obstructing investigations which would have led to discovery of further exculpatory evidence; and by the additional wrongdoing set forth above, thereby unconstitutionally depriving Plaintiff of his liberty and violating his right to a fair and impartial trial and not to be wrongfully convicted, as guaranteed by the Fourteenth Amendment to the U.S. Constitution.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth

27

Amendment of the United States Constitution, and therefore declines to answer at this time.

69. *Additionally and/or alternatively, all the Defendants named above failed to intervene to stop Plaintiff's wrongful prosecution and conviction and resultant imprisonment despite having the opportunity and duty to do so.*

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

70. The actions of Defendants, Burge, Byrne, Dignan, Binkowski, McWeeny, Bosco, Madigan, Grunhard, Martin, Devine, Shines, Hillard and Needham in depriving Plaintiff of his right to a fair trial and not to be wrongfully convicted and imprisoned, *and, additionally and/or alternatively, in failing to intervene to stop said violations*, were the direct and proximate cause of the injuries to Plaintiff which are set forth above.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

WHEREFORE, Defendant denies Plaintiff is entitled to any judgment whatsoever against him and prays this Honorable Court will enter judgment in his favor and allow for the costs of defending this lawsuit.

## COUNT II

### (42 U.S.C. § 1983 Claim for False Arrest and Imprisonment)

71. Plaintiff re-alleges paragraphs 1 through 70.

**ANSWER:**     Defendant incorporates fully as if fully stated herein his responses to paragraphs 1 through 70 of Plaintiff's First Amended Complaint.

72.     The actions of Defendants Burge, Byrne, Dignan, Grunhard, McWeeny, Bosco, Binkowski, Madigan, and Martin, individually, jointly, and in conspiracy, in falsely arresting and imprisoning Plaintiff, and of these same Defendants, together with Defendants Devine, Shines, Hillard, and Needham, individually, jointly, and in conspiracy, in continuing Plaintiff's imprisonment for twenty-one years, without probable cause, violated Plaintiff's Fourth and Fourteenth Amendment rights to be free from unreasonable seizures, and deprived Plaintiff of liberty without due process of law.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

*73.     Additionally Defendants Devine, Martin, Burge, Dignan, Binkowski, McWeeny, Bosco, Madigan, and Grunhard failed to prevent Plaintiff's wrongful arrest and resultant imprisonment despite having the opportunity and duty to do so.*

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

74.     The actions of the Defendants in falsely imprisoning Plaintiff, continuing said false imprisonment, covering up their own misconduct, *and/or failing to prevent said unlawful arrest and imprisonment,* were the direct and proximate cause of Plaintiff's injuries and damages as more fully set forth above.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

WHEREFORE, Defendant denies Plaintiff is entitled to any judgment whatsoever against him and prays this Honorable Court will enter judgment in his favor and allow for the costs of defending this lawsuit.

## COUNT III

### (42 U.S.C. § 1983 Claim for Torture and Physical Abuse)

75.     Plaintiff re-alleges paragraphs 1 through 74.

**ANSWER:**     Defendant incorporates as if fully stated herein his responses to paragraphs 1 through 74 of Plaintiff's First Amended Complaint.

76.     The actions of Defendants Burge, Byrne, Dignan, Grunhard, McWeeny, Bosco, and Binkowski, in torturing and physically abusing Plaintiff, and in threatening him with additional torture and physical abuse, individually, jointly and in conspiracy violated Plaintiff's Fourth and Fourteenth Amendment rights to be free from unreasonable seizures.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

77.     Defendants Burge, Byrne, Dignan, Grunhard, McWeeny, Bosco, Binkowski, and Martin were aware of the torture and physical abuse of the Plaintiff, and participated in it by allowing the torture and abuse to continue while having the obligation and duty to stop it, and by failing to report the abuse to superiors in the Police Department and the State's Attorney's Office.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

78. The actions of the Defendants, individually, jointly and in conspiracy, in torturing and physically abusing the Plaintiff, threatening to inflict further torture and physical abuse, and/or failing to stop the torture and abuse while having the opportunity and duty to do so, were the direct and proximate cause of Plaintiff's injuries and damages as more fully set forth above.

**ANSWER:** Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

79. *Additionally, Defendants Devine, Martin, Burge, Byrne, Dignan, Grunhard, McWeeny, Bosco, Binkowski, and Madigan and co-conspirators Mayor and former State's Attorney Richard M. Daley and former Mayor Jane Byrne failed to intervene to stop Defendant Burge and his Area 2 co-conspirators from continuing their coercive interrogations and torture tactics, inter alia, by prosecuting and otherwise disciplining them when they first learned of their criminal conduct in 1982, despite having the opportunity and duty to do so.*

**ANSWER:** Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

80. The actions of the Defendants, individually, jointly and in conspiracy, in torturing and physically abusing the Plaintiff, threatening to inflict further torture and physical abuse, and/or failing to stop *or prevent* the torture and abuse while having the opportunity and duty to do so, were the direct and proximate cause of Plaintiff's injuries and damages as more fully set forth above.

**ANSWER:** Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

31

WHEREFORE, Defendant denies Plaintiff is entitled to any judgment whatsoever against him and prays this Honorable Court will enter judgment in his favor and allow for the costs of defending this lawsuit.

## COUNT IV

### (42 U.S.C. § 1983 Claim for Coercive Interrogation)

81.    Plaintiff re-alleges paragraphs 1 through 80.

**ANSWER:**    Defendant incorporates as if fully stated herein his responses to paragraphs 1 through 80 of Plaintiff's First Amended Complaint.

82.    The actions of Defendants Burge, Byrne, Dignan, Grunhard, McWeeny, Bosco, and Binkowski, individually, jointly, and in conspiracy, in coercively interrogating Plaintiff, and in using torture techniques that "shock the conscience" during those interrogations, resulted in false, coerced, and fabricated admissions, and violated Plaintiff's Fifth and Fourteenth Amendment rights to be free from compulsory self-incrimination and deprivation of liberty without due process of law.

**ANSWER:**    Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

83.    The actions of these Defendants in using torture and other coercive techniques to interrogate Plaintiff, and/or condoning and permitting the use of those techniques, were the direct and proximate cause of Plaintiff's injuries and damages as more fully set forth above.

**ANSWER:**    Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

84.    *Additionally, the failure of Defendants Devine, Martin, Burge, Byrne, Dignan,*

32

*Grunhard, McWeeny, Bosco, Binkowski, and Madigan and co-conspirators Mayor and former*

*State's Attorney Richard M. Daley and former Mayor Jane Byrne to intervene to stop Defendant*

*Burge and his Area 2 co-conspirators from continuing their coercive interrogations and torture*

*tactics, inter alia, by prosecuting and otherwise disciplining them when they first learned of their*

*criminal conduct in 1982, despite having the opportunity and duty to do so, proximately caused*

*Plaintiff's coercive interrogation by torture and his resultant injuries and damages as more fully*

*set forth above.*

**ANSWER:**    Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

WHEREFORE, Defendant denies Plaintiff is entitled to any judgment whatsoever against him and prays this Honorable Court will enter judgment in his favor and allow for the costs of defending this lawsuit.

## COUNT VI[1]

### (42 U.S.C. § 1983 *Monell* Policy Claim Against City of Chicago)

Defendant makes no response to the allegations contained in Plaintiff's Count VI, paragraphs 85-91, in that said allegations are directed toward another Defendant.

## COUNT VII

### (State Law Claim for False Arrest and Imprisonment)

92.    Plaintiff re-alleges paragraphs 1 through 91.

**ANSWER:**    Defendant incorporates fully as if fully stated herein his responses to paragraphs 1 through 91 of Plaintiff's First Amended Complaint.

---

[1]Count 5 was dismissed by Order of Court dated February 2, 2006.

93. The arrest and imprisonment of Plaintiff, without probable cause, individually, jointly, and in conspiracy by Defendants Burge, Byrne, Dignan, Grunhard, McWeeny, Bosco, Binkowski, Madigan, and Martin, and its continuation by these Defendants, together with Defendants Devine, Shines, Hillard, and Needham, individually, jointly, and in conspiracy, constituted the torts of false arrest and imprisonment under Illinois law.

**ANSWER:** Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

94. Defendants' actions in arresting and imprisoning Plaintiff were willful and wanton.

**ANSWER:** Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

WHEREFORE, Defendant denies Plaintiff is entitled to any judgment whatsoever against him and prays this Honorable Court will enter judgment in his favor and allow for the costs of defending this lawsuit.

## COUNT VIII

### (State Law Claim for Malicious Prosecution)

95. Plaintiff re-alleges paragraphs 1 through 94.

**ANSWER:** Defendant incorporates as if fully stated herein his responses to paragraphs 1 through 94 of Plaintiff's First Amended Complaint.

96. Defendants Burge, Byrne, Dignan, Grunhard, McWeeny, Bosco, Binkowski, Madigan, and Martin, individually, jointly, and in conspiracy, initiated a malicious prosecution without probable cause against Plaintiff, and these same Defendants, together with Defendants

Devine, Shines, Hillard, and Needham, individually, jointly, and in conspiracy, continued said prosecution, again without probable cause. Said prosecution was ultimately terminated in Plaintiff's favor. The Defendants' actions were done in a willful and wanton manner, and directly and proximately caused the injury and damage to Plaintiff set forth above.

**ANSWER:** Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

WHEREFORE, Defendant denies Plaintiff is entitled to any judgment whatsoever against him and prays this Honorable Court will enter judgment in his favor and allow for the costs of defending this lawsuit.

## COUNT IX

### (State Law Claim for Intentional Infliction of Emotional Distress)

97.     Plaintiff re-alleges paragraphs 1 through 96.

**ANSWER:** Defendant incorporates as if fully stated herein his responses to paragraphs 1 through 96 of Plaintiff's First Amended Complaint.

98.     Defendants Burge, Byrne, Dignan, Grunhard, McWeeny, Bosco, Binkowski, Madigan, Martin, Devine, Shines, Hillard, and Needham, individually, jointly, and in conspiracy, by, *inter alia*, torturing a false confession from Plaintiff and/or by failing to stop said torture, by constructing and fabricating the details of said confession, and by procuring Plaintiff's prosecution, conviction, and life sentence for a murder he did not commit by means of said false confession, engaged in extreme and outrageous conduct. Additionally these same Defendants, together with Defendants Devine, Hillard, Shines, Martin and Needham, individually, jointly, and in conspiracy, by fabricating, coercing, and suppressing other evidence, by continuing

35

Plaintiff's false imprisonment after procuring his wrongful conviction, by refusing to investigate, and by otherwise abusing Plaintiff, engaged in additional extreme and outrageous conduct.

**ANSWER:**    Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

99.    Defendants Burge, Byrne, Dignan, Grunhard, McWeeny, Bosco, Binkowski, Madigan, Martin, Devine, Shines, Hillard, and Needham intended, by subjecting Plaintiff to such humiliating, degrading conduct, to inflict severe emotional distress on Plaintiff, and knew that their conduct would cause Plaintiff and his family severe emotional distress.


**ANSWER:**    Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

100.    As a direct and proximate result of Defendants' outrageous conduct, Plaintiff was injured, and has experienced, and continues to experience, severe emotional distress, including nightmares, sleep disruption, symptoms of post traumatic stress disorder, anxiety, depression, and inability to focus or concentrate.

**ANSWER:**    Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

WHEREFORE, Defendant denies Plaintiff is entitled to any judgment whatsoever against him and prays this Honorable Court will enter judgment in his favor and allow for the costs of defending this lawsuit.

## COUNT X

### (State Claim for Conspiracy)

101.    Plaintiff re-alleges paragraphs 1 through 100.

**ANSWER:**    Defendant incorporates as if fully stated herein his responses to paragraphs 1 through 100 of Plaintiff's First Amended Complaint.

102.    Defendants Burge, Byrne, Dignan, Grunhard, McWeeny, Bosco, Binkowski, Madigan, Martin, Devine, Shines, Hillard, and Needham, with other unsued co-conspirators, including police and prosecutorial investigative, supervisory, and command personnel, together reached an understanding, engaged in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to falsely imprison and/or to continue said imprisonment, to maliciously prosecute and/or continue said prosecution, and to intentionally inflict severe emotional distress on Plaintiff.

**ANSWER:**    Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

103.    In furtherance of this conspiracy or conspiracies, the Defendants named above, together with their unsued co-conspirators, committed the overt acts set forth above, including, but not limited to, those set forth in paragraph 65 above.

**ANSWER:**    Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

104.    Said conspirac(ies) and overt acts were an are continuing in nature.

**ANSWER:**    Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

37

105.     Defendants' and their co-conspirators' overt acts, as set forth above, which were committed jointly and/or while conspiring together to falsely imprison, maliciously prosecute, and intentionally inflict emotional distress on the Plaintiff, constitute the tort of conspiracy as set forth above.

**ANSWER:**     Defendant, on the advice of counsel due to the threat of a potential criminal prosecution, reluctantly asserts the rights guaranteed to him by the Fifth Amendment of the United States Constitution, and therefore declines to answer at this time.

WHEREFORE, Defendant denies Plaintiff is entitled to any judgment whatsoever against him and prays this Honorable Court will enter judgment in his favor and allow for the costs of defending this lawsuit.

## COUNT XI

### (State Law Respondeat Superior Claim)

Defendant makes no response to the allegations contained in Plaintiff's Count XI, paragraphs 106-108, in that said allegations are directed toward another Defendant.

## COUNT XII

### (745 ILCS 10/9-102 and Common Law Claims Against the City and County)

Defendant makes no response to the allegations contained in Plaintiff's Count XII, paragraphs 109-114, in that said allegations are directed toward another Defendant.

## DEFENDANT'S AFFIRMATIVE DEFENSES

Defendant Jon Burge asserts the following affirmative defenses to Plaintiff's First Amended Complaint:

### First Affirmative Defense

Plaintiff's claims against Defendant are barred in whole or in part by the doctrine of qualified immunity.

### Second Affirmative Defense

Plaintiff's claims against Defendant are barred in whole or in part by the doctrines of collateral estoppel and *res judicata*.

### Third Affirmative Defense

Plaintiff failed to mitigate his damages, if any.

### Fourth Affirmative Defense

Plaintiff's claims are barred in whole or in part by the applicable statute of limitations.

### Fifth Affirmative Defense

Plaintiff's claims are barred in whole or in part by the doctrine of judicial estoppel.

### Sixth Affirmative Defense

The presence of probable cause defeats Plaintiff's constitutional and state law claims arising from his arrest, prosecution and conviction for the murder of Darrin Ross.

### Seventh Affirmative Defense

Plaintiff's participation in the murder of Darrin Ross bars his claims of wrongful conviction and malicious prosecution.

### Eighth Affirmative Defense

With respect to Plaintiff's state law claims, Defendant is immune from liability for the conduct alleged in Plaintiff's First Amended Complaint based on the various provisions of the Illinois Tort Immunity Act, including but not limited to, §§ 2-201, 2-202 and 2-204.

### Ninth Affirmative Defense

Plaintiff's claims in the complaint are barred by the prior settlement of his claims in Case No. 86 C 7231, in the United States District Court, Northern District of Illinois, as set forth in a

Stipulation agreed to by Plaintiff and executed on his behalf in 1988, which Stipulation further was incorporated into a judgment order entered by Judge William T. Hart on February 8, 1988.

### Tenth Affirmative Defense

To the extent any injuries or damages claimed by Plaintiff were proximately caused, in whole or in part, by negligent, willful, wanton and/or other wrongful conduct on the part of plaintiff as reflected in the public record, including but not limited to, police reports, certified statements of conviction, court records, published court opinions, and decisions of the Illinois Prisoner Review Board, any verdict or judgment obtained by Plaintiff must be reduced by an amount commensurate with the degree of fault attributed to Plaintiff by the jury in this case.

### **DEFENDANT'S JURY DEMAND**

Defendant Jon Burge hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: October 11, 2010                                  RESPECTFULLY SUBMITTED,


/s Elizabeth A. Ekl
ELIZABETH A. EKL, *One of the Attorneys for Defendant Jon Burge*




JAMES G. SOTOS
ELIZABETH A. EKL
JOHN T. TIMBO
CHRISTINA S. WHITE
JAMES G. SOTOS & ASSOCIATES, LTD.
550 East Devon Avenue, Suite 150
Itasca, IL 60143
630-735-3300
630-773-0980 Facsimile
eekl@jsotoslaw.com

40

## **CERTIFICATE OF SERVICE**

I certify under penalty of perjury pursuant to 28 U.S.C.A. § 1746 that the foregoing is true and correct, that on **Monday**, **October 11, 2010**, I electronically filed the foregoing **Defendant Jon Burge's Answer to Plaintiff's First Amended Complaint** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys listed on the attached Service List.

/s Elizabeth A. Ekl _____

ELIZABETH A. EKL, *One of the Attorneys for Defendant Jon Burge*

JAMES G. SOTOS
ELIZABETH A. EKL
JOHN T. TIMBO
CHRISTINA S. WHITE
JAMES G. SOTOS & ASSOCIATES, LTD.
550 East Devon Avenue, Suite 150
Itasca, IL 60143
630-735-3300
630-773-0980 Facsimile
eekl@jsotoslaw.com

**SERVICE LIST**

**DARRELL CANNON V. JON BURGE, ET AL.**
**05 C 2192**

**Attorneys for Darrell Cannon**:
Locke E. Bowman, III
MACARTHUR JUSTICE CENTER
Northwestern University School of Law
357 East Chicago Avenue
Chicago, IL 60611
(312) 503-0844
(312) 503-1272 (Fax)
l-bowman@law.northwestern.edu

G. Flint Taylor; Joey L. Mogul;
Benjamin H. Elson
PEOPLE'S LAW OFFICE
1180 N. Milwaukee Ave.
Chicago, IL 60622
(773) 235-0070
(773) 235-6699 (Fax)
gftaylorjr@aol.com
joeymogul@aol.com
elsonben@aol.com

**Attorneys for City of Chicago, Terry Hillard and Thomas Needham**:
Terrence Burns; Harry Arger; Daniel Noland; Paul Michalik
DYKEMA GOSSETT PLLC
10 South Wacker Drive
Suite 2300
Chicago, IL 60606
(312) 876-1700
(312) 876-1155 (Fax)
tburns@dykema.com; harger@dykema.com; dnoland@dykema.com; pmichalik@dykema.com

**Attorneys for the County of Cook, Cook County State's Attorney's Office**:
Patrrick T. Driscoll, Jr.; Stephen L. Garcia; John Paul Heil, Jr.; Paul Anthony Castiglione
COOK COUNTY STATE'S ATTORNEY
500 Richard J. Daley Center
Chicago, IL 60602
(312) 603-6461
(312) 603-5735 (Fax)
sgarcia@cookcountygov.com; pdrisco@cookcountygov.com; pcastig@cookcountygov.com

**Attorneys for Leroy Martin and Gayle Shines:**
Eileen Letts; Kenya Jenkins-Wright; Martin Peter Greene; Kevin Thomas Lee
GREENE AND LETTS
111 West Washington
Suite 1650
Chicago, IL 60602
(312) 346-1100
(312) 346-4571 (Fax)
emletts@greeneandletts.com; kajenkins@greeneandletts.com; mpgreene@greeneandletts.com;
ktlee@greeneandletts.com