# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DARRELL CANNON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 05 C 2192 |
| ) | |
| FORMER CHICAGO POLICE LT. JON ) | |
| BURGE, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

In his First Amended Complaint, Plaintiff Darrell Cannon ("Cannon") alleges that certain City of Chicago employees and the City itself (hereinafter "the City Defendants") violated his civil rights by torturing him during interrogations held at the Chicago Police Department's Area 2 Detective Division under the direction of Former Chicago Police Lieutenant Jon Burge. More specifically, Cannon alleges that on November 2, 1983, Defendant Chicago Police Officers Jon Byrne, Peter Dignan, and Charles Grunhard tortured and coerced him into confessing to his involvement in the murder of Darrin Ross. His constitutional claims against the City Defendants include: (1) deprivation of the right to a fair trial (Count I); (2) false arrest and false imprisonment (Count II); (3) torture and physical abuse (Count III); (4) coercive interrogation (Count IV); and (5) a *Monell* policy claim (Count VI). *See* 42 U.S.C. § 1983. Cannon's state law claims against the City Defendants include: (1) false arrest and imprisonment (Count VII); (2) malicious prosecution (Count VIII); (3) intentional infliction of emotional distress (Count IX); (4) conspiracy (Count X); (5) respondeat superior (Count XI); and (6) indemnification (Count XII).

Before the Court is the City Defendants' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(b).[1] After the parties completed their briefing, the Court conducted oral argument on September 1, 2011. The Court also asked the parties for additional briefing concerning Plaintiff's unconscionability defense. Based on the parties' briefs, the record, and oral argument, the Court grants the City Defendants' summary judgment motion as discussed in detail below.

## BACKGROUND

On October 26, 1983, Darrin Ross was shot and killed, and on November 2, 1983, Chicago police officers arrested and charged Cannon in connection with Ross' murder. (R. 361, Defs.' Rule 56.1 Stmt. Facts ¶¶ 12, 13.) Cannon claims that Defendant Chicago Police Officers Byrne, Dignan, and Grunhard tortured and coerced him into confessing to the Ross murder by performing mock executions, attempting to suspend him in the air while handcuffed, and by using an electric cattle prod, among other methods. (*Id*. ¶ 14; R. 381, Pl.'s Rule 56.1 Stmt. Add'l Facts ¶¶ 1, 2, 4.) On November 7, 1983, Cannon lodged a complaint with the Office of Professional Standards ("OPS") after which OPS opened an investigation into Cannon's allegations of torture and abuse.[2] (Defs.' Stmt. Facts ¶ 15; Pl.'s Stmt. Facts ¶ 5.)

---

[1] The Court will discuss the Cook County Defendants' summary judgment motion in a separate order.

[2] At the time of the incident underlying this lawsuit, the Chicago Police Department's Office of Professional Standards ("OPS") was responsible for investigating excessive force complaints against Chicago police officers. In September 2007, the City removed OPS from the Chicago Police Department and reorganized it as separate department – the Independent Police Review Authority ("IPRA") – which reports directly to the Mayor of the City of Chicago.

In the meantime, attorney Ronald Himel represented Cannon in his criminal proceedings and filed a motion to suppress Cannon's confession. (Defs.' Stmt. Facts ¶¶ 16, 18.) At the March 1984 suppression hearing in the Circuit Court of Cook County, Defendant Officers Byrne, Dignan, and Grunhard denied that they participated or witnessed Cannon's abuse and torture. (Pl.'s Stmt. Facts ¶ 6.) Thereafter, the trial court denied Cannon's motion to suppress, after which a jury convicted Cannon of Ross' murder and the trial court sentenced him to natural life in prison. (Pl.'s Stmt. Facts ¶ 7; Defs.' Stmt. Facts ¶ 23.) That same year, Defendants Byrne, Dignan, Grunhard, Michael Bosco, and Ray Binkowski provided statements to OPS denying participating or witnessing Cannon's torture and abuse. (Pl.'s Stmt. Facts ¶ 5.)

In September 1986, Cannon filed a pro se complaint in the United States District Court for the Northern District of Illinois pursuant to 42 U.S.C. § 1983 against Defendant Officers Byrne, Dignan, and Grunhard alleging violations of his constitutional rights in connection with their use of excessive force on November 2, 1983. (Pl.'s Stmt. Facts ¶ 9; Defs.' Stmt. Facts ¶ 34.) In his pro se complaint, Cannon sought $15,000 in damages, as well as "such other and further relief as this Court may deem just and proper." (R. 391-3, Ex. 5, Compl.) The presiding district court judge, Judge William T. Hart, appointed attorney Paul Lanphier to represent Cannon in his 1986 federal lawsuit. (Pl.'s Stmt. Facts ¶ 9; Defs.' Stmt. Facts ¶ 38.) Lanphier conducted written discovery and took the depositions of Defendants Byrne, Dignan, and Grunhard, along with the deposition of Chicago Police Officer Daniel McWeeny. (Pl.'s Stmt. Facts ¶ 9; Defs.' Stmt. Facts ¶ 42.) When deposing Byrne, Dignan, Grunhard, and McWeeny, Lanphier never questioned these officers about other allegations of torture at Area 2. (Defs.' Stmt. Facts ¶ 43.)

In January 1988, Lanphier sent Cannon a letter recommending that Cannon accept a settlement offer of $3,000 to which Cannon agreed. (Pl.'s Stmt. Facts ¶¶ 12, 13; Defs.' Stmt. Facts ¶ 48.) Lanphier explained to Cannon that the likelihood of success in his case was nonexistent due to witness credibility, namely, that a jury would not accept his version of the facts because Cannon had a criminal record. (Pl.'s Stmt. Facts ¶ 12.) On February 8, 1988, Cannon entered into a settlement agreement and stipulation ("1998 Stipulation") accepting $3,000 in exchange for dismissing the excessive force action. (Pl.'s Stmt. Facts ¶ 14; Defs.' Stmt. Facts ¶ 50.) The 1998 Stipulation provided in relevant part:

> Plaintiff agrees to indemnify and hold harmless the City of Chicago, its officers, agents and employees including, but not limited to, the remaining Defendant, from any claims, losses, damages or expenses incurred or which may be incurred, by reason of the incident which was the basis of the litigation....
>
> Plaintiff understands, upon advice of his counsel, and agrees that such Judgment is a final and total settlement of all claims he has, or may have in the future, arising either directly or indirectly out of the incident which was the basis of this litigation, and that such finality is applicable to the remaining Defendant, the CITY OF CHICAGO, its officers, agents and employees.

(Defs' Stmt. Facts ¶ 51.) It is undisputed that Cannon testified that he knew when he signed the 1988 Stipulation that he was agreeing to the settlement, that the lawsuit would be ending, and that no one forced him to sign it. (*Id*. ¶ 53.) Pursuant to the 1988 Stipulation, Judge Hart entered judgment in favor of Cannon and against Defendants on February 8, 1988. (*Id*. ¶ 56.)

Meanwhile, on appeal from his criminal conviction, the Illinois Appellate Court affirmed the denial of Cannon's motion to suppress, but remanded his case for a hearing on the State's use of peremptory challenges. *See People v. Cannon,* 150 Ill.App.3d 1009, 104 Ill.Dec. 82, 502 N.E.2d 345 (1st Dist. 1986). After holding a *Batson* hearing, the trial court ordered a new trial at which Cannon moved to suppress his confession arguing that Area 2 police officers tortured not

4

only him, but other suspects into confessing. (Defs.' Stmt. Facts ¶¶ 69, 71; Pl.'s Stmt. Facts ¶ 22.) The trial court did not revisit the question of whether Cannon's confession was voluntary at the 1994 re-trial. *See People v. Cannon,* 293 Ill.App.3d 634, 635, 227 Ill.Dec. 1000, 688 N.E.2d 693 (1st Dist. 1997). Thereafter, the jury found Cannon guilty of Ross' murder and the trial court sentenced Cannon to natural life in prison. (Pl.'s Stmt. Facts ¶ 24.)

On appeal from the 1994 conviction, the Illinois Appellate Court vacated Cannon's conviction and sentence and remanded his case to the trial court for a hearing on the voluntariness of Cannon's confession. *See Cannon,* 293 Ill.App.3d at 635. The State ultimately dismissed the charges against Cannon on April 22, 2004. (Pl.'s Stmt. Facts ¶ 25.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quotation omitted).

5

## ANALYSIS

At issue in this summary judgment motion is whether Cannon's 1988 Stipulation prohibits all of Cannon's claims against the City Defendants in the present lawsuit. In the Court's February 2, 2006, Memorandum, Opinion, and Order granting in part and denying in part Defendants' Rule 12(b)(6) motion to dismiss, the Court concluded that the 1988 Stipulation is "clear, unambiguous, and specific" and covers the remaining "causes of action plaintiff currently brings before the Court." (R. 88, 2/2/06, Mem., Op., & Order, at 11, 13.) The relevant section of the February 2, 2006 Memorandum, Opinion, and Order states:

> Because the 1988 Stipulation is clear, unambiguous and specific, the Court will look to the document itself to determine its meaning and the parties' intent. *See Rakowski*, 104 Ill.2d at 323, 472 N.E.2d at 794, 84 Ill. Dec. at 657; *see also Ainsworth Corp. v. Cenco Inc.*, 158 Ill. App. 3d 639, 650, 511 N.E.2d 1149, 1156, 110 Ill. Dec. 829, 836 (1st Dist. 1987); *Crown Corr, Inc. v. Wil-Freds Constr., Inc.*, No. 94-6535, 2000 WL 1809996, at *3 (N.D. Ill. Dec. 11, 2000); *Rail-Ways, Inc. v. Indiana & Kensington R.R. Co.*, No. 95-1526, 1998 WL 792481, at *4 (N.D. Ill. Nov. 9, 1998). The 1988 Stipulation, on its face, releases all claims that arise directly or indirectly from the "incident." The 1986 complaint makes clear that the "incident" is Byrne's, Dignen's and Grunhard's treatment of Plaintiff on November 2, 1983. (R. 28-1; City Defs.' Mot. to Dismiss, Ex. C at 3.) Likewise, Plaintiff's treatment on November 2, 1983 serves as the basis for the Complaint. (*See*, *e.g.*, R. 1-1; Compl. at ¶¶ 18-30.) Because the "incident" serves as the basis for the Complaint, the twelve causes of action Plaintiff asserts in it necessarily arise either directly or indirectly from the "incident." Therefore, the 1988 Stipulation, on its face, purports to cover those causes of action.

(*Id*. at 11-12.)

Because the Court has already concluded that the 1988 Stipulation covers the claims in the present lawsuit, the Court turns to Cannon's arguments that the 1988 Stipulation is invalid based on Defendants' fraudulent concealment and the doctrine of unconscionability.

## I. Fraudulent Concealment

First, Cannon argues that the 1988 Stipulation is invalid and unenforceable based on the City Defendants fraudulently concealing facts regarding the alleged excessive force and torture underlying Cannon's 1986 civil rights lawsuit. Under Illinois law, a "settlement agreement is in the nature of a contract and is governed by principles of contract law." *K4 Enter., Inc. v. Grater, Inc.*, 394 Ill.App.3d 307, 313, 333 Ill.Dec. 198, 914 N.E.2d 617 (1st Dist. 2009). In Illinois, "[p]ublic policy strongly favors the freedom to contract" and "[s]ettlement agreements are encouraged and should be given their full force and effect." *Green v. Safeco Life Ins. Co.,* 312 Ill.App.3d 577, 581, 245 Ill.Dec. 140, 727 N.E.2d 393 (5th Dist. 2000). "Once the defendant establishes the existence of a release, legal and binding on its face, the burden shifts to the plaintiff to prove it invalid by clear and convincing evidence." *Hurd v. Wildman, Harrold, Allen & Dixon,* 303 Ill.App.3d 84, 89, 236 Ill.Dec. 482, 486, 707 N.E.2d 609, 613 (1st Dist. 1999). "Even where the parties intend to release a specific claim, the release of that claim will not be enforced if there has been fraud, duress, mutual mistake, or, at least in some cases, unconscionability." *Carlile v. Snap-on Tools,* 271 Ill.App.3d 833, 839, 207 Ill.Dec. 861, 866, 648 N.E.2d 317, 322 (4th Dist. 1995); *see also Dugan v. R.J. Corman R. Co.,* 344 F.3d 662, 667 (7th Cir. 2003) ("In the absence of fraud, mistake, unconscionability, or like defenses, a person is bound by all provisions in a contract.").

The Seventh Circuit's decision in *Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984), *rev'd on other grounds*, *Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005), lends guidance to the Court's analysis. In *Bell*, the Seventh Circuit affirmed the Eastern District of Wisconsin's conclusion that a settlement agreement did not bar a constitutional claim of access to courts

because the record was replete with allegations of fraud, concealment, and a broad-based cover-up. *See id.* at 1227. As the Seventh Circuit later explained, the "cornerstone of our decision in *Bell* was that the conspiracy had prevented a full and open disclosure of facts crucial to the cause of action, rendering hollow the plaintiffs' right of access." *Vasquez v. Hernandez,* 60 F.3d 325, 329 (7th Cir. 1995).

Here, Cannon argues that there are material questions of fact for trial whether the 1988 Stipulation is unenforceable because the City Defendants fraudulently concealed information from Cannon to induce him to enter into the 1988 Stipulation. Unlike the situation in *Bell* – in which the police shot and killed the victim in their attempt to arrest him – Cannon had first-hand knowledge of his torture and abuse underlying his Fourth Amendment excessive force claim at the time he filed his 1986 federal lawsuit.[3] *See Bell,* 746 F.2d at 1228; *see also Thompson v. Boggs,* 33 F.3d 847, 852-53 (7th Cir. 1994) (because plaintiff "was personally involved in the incident and thus had firsthand knowledge of all the facts and circumstances surrounding his arrest" he was not prevented from bringing his civil rights claim). To clarify, in *Bell*, the arresting officers' fraudulent concealment of the facts crucial to the victim's constitutional claim prohibited the victim's relatives and estate from pursuing his constitutional claim. *See id.* at 1228. In other words, the police officers' concealment of the facts prevented the victim's family from realizing that they had a cause of action in the first instance. *See id.*; *Thompson*, 33 F.3d at 852.

---

[3] In fact, at oral argument, Cannon's counsel admitted that Cannon knew the facts surrounding his own constitutional violation, namely, that Cannon knew he had been tortured.

8

In the present matter, there is evidence in the record that Cannon, his criminal defense attorney, and his attorney in his 1986 civil action all knew that Area 2 police officers had abused and tortured Cannon and others well before Cannon entered into the 1988 Stipulation. In his October 20, 2010 deposition, for example, Cannon testified that because certain Defendants took him to "a torture site and tortured me like they did, it did not – I did not get the impression that I was the first one that they had ever done that to." (Defs.' Stmt. Facts ¶ 36; R. 363-11, Ex. K, Cannon Dep., at 527.) Cannon further testified that he never believed from day one that he was the only person Defendant Officers tortured. (Defs.' Stmt. Facts ¶ 36, Cannon Dep., at 545.) In addition, Cannon's criminal defense attorney Ronald Himel testified that at the time of Cannon's criminal proceedings, he was aware of Andrew Wilson's complaint of abuse and torture by Area 2 police detectives.[4] (Defs.' Stmt. Facts ¶ 17; R. 363-2, Ex. B, Himel Dep., at 13-14.) Also, at Cannon's March 15, 1984 suppression hearing, Himel argued on the record that "[t]his was not the first time the allegations have been raised as to Area 2 Violent Crimes using an electronic devise to shock defendants." (Defs.' Stmt. Facts ¶ 20.) Additional evidence in the record shows that Cannon told his appointed attorney, Paul Lanphier, to look into Defendant Police Officers' arrests reports to see how many cases ended in confessions or charges of torture. (*Id*. ¶ 41.) Cannon also wrote to Lanphier in 1987 and explained that Defendant Police Officers tortured him and others. (*Id*. ¶ 46.) In this letter, Cannon sent Lanphier newspaper clippings regarding Defendants Officers Byrne and Dignan that included allegations of their abuse and torture of arrestees. (*Id*.) In Cannon's January 24, 1988 letter to Lanphier accepting the settlement offer, he stated that despite settling this claim, Defendant Officers Byrne, Dignan, and Grunhard would

---

[4] *See People v. Wilson,* 116 Ill.2d 29, 106 Ill.Dec. 771, 506 N.E.2d 571 (Ill. 1987).

continue to torture others. (*Id*. ¶ 48.)

Based on this evidence, Cannon and his counsel were aware of his allegations of abuse and torture during the pendency of his criminal and civil cases, as well as other allegations of abuse and torture by Area 2 police officers. Therefore, unlike the plaintiffs in *Bell*, because it is undisputed that Cannon had first-hand knowledge of his excessive force claim and knowledge that others were tortured at that time, the fact that Cannon and his counsel did not know the full extent of torture and abuse at the Chicago Police Department's Area 2 Headquarters did not prohibit Cannon from bringing his excessive force claim in 1986. *See Chicago Export Packing Co. v. Teledyne Indus., Inc.,* 207 Ill.App.3d 659, 663, 152 Ill.Dec. 639, 566 N.E.2d 326 (1st Dist. 1990) ("A person may not enter into a transaction with his eyes closed to available information and then charge that he has been deceived by another").

Even if Cannon and his attorneys were completely unaware of the other allegations of abuse and torture by Area 2 detectives, Cannon has failed to present evidence that there is a genuine dispute as to any material fact that the City Defendants fraudulently concealed information from him in order to induce him to enter into the 1988 Stipulation. Under Illinois law, a party commits fraud if he knowingly misrepresents the truth or conceals a material fact in order to intentionally induce another to act to his detriment. *See People v. Montoya,* 373 Ill.App.3d 78, 82, 311 Ill.Dec. 389, 868 N.E.2d 389 (2d Dist. 2007) (citing Black's Law Dictionary 670 (7th ed. 1999)); *see also Hassan v. Yusuf,* 408 Ill.App.3d 327, 343, 348 Ill.Dec. 654, 944 N.E.2d 895 (1st Dist. 2011) ("Fraud may be perpetrated by a misrepresentation or by concealment.").

Here, Cannon does not argue that Defendant Officers committed affirmative acts or made representations to conceal information intended to induce him into settling his 1986 civil rights action. Indeed, at oral argument, Cannon's counsel could not identify any specific misrepresentations made by Defendants. Instead, Cannon argues that because he was deprived evidence of the extensive Area 2 cover-up of abuse and torture, he could not attack the credibility of Defendant Officers Byrne, Dignan, and Grunhard, and thus he took his counsel's advice to settle his lawsuit. More specifically, Cannon argues that he "was induced to settle the 1986 case because Paul Lanphier, his court-appointed attorney, told him that there was no way that Plaintiff could overcome the credibility of the three officer defendants and impeach their denials." (R. 384, Resp. Brief, at 16.) Lanphier also informed Cannon that due to his conviction record, it would be unlikely that a jury would accept his version of the facts. (Pl.'s Stmt. Facts ¶ 12.) Although the Court must construe the facts and all reasonable inferences in Cannon's favor at this procedural posture, Lanphier's advice to Cannon does not create a genuine dispute as to any material fact that Defendant Officers intentionally induced Cannon into settling the 1986 lawsuit. *See Springer v. Durflinger,* 518 F.3d 479, 484 (7th Cir. 2008) ("[I]t is well-settled that speculation may not be used to manufacture a genuine issue of fact.") (internal quotation marks omitted); *see also Leitgen v. Franciscan Skemp Healthcare, Inc.,* 630 F.3d 668, 675 (7th Cir. 2011) (inferences that are too attenuated cannot survive summary judgment). And, although there is evidence in the record that Defendant Officers denied torturing Cannon at the March 1984 suppression hearing and in their 1984 OPS statements, their denial does not amount to concealment because Cannon was well aware of the facts surrounding his torture and abuse. Moreover, regarding the other instances of torture, Cannon has not produced any evidence that

11

his attorney ever asked Defendants about other instances of torture during the discovery in his 1986 civil rights lawsuit, thus Cannon has failed to explain how Defendants could have misrepresented or concealed these facts when Cannon's counsel never asked for them in the first instance. Therefore, Cannon's argument that the 1988 Stipulation is unenforceable based on Defendants' fraudulent concealment fails.

## II.     Unconscionability

Next, Cannon argues that the 1988 Stipulation is unconscionable, and therefore, unenforceable under Illinois law. *See Razor v. Hyundai Motor Am.,* 222 Ill.2d 75, 99, 305 Ill.Dec. 15, 854 N.E.2d 607 (Ill. 2006) ("A determination of whether a contractual clause is unconscionable is a matter of law, to be decided by the court"). "A contract is unconscionable when it is improvident, oppressive, or totally one-sided." *Streams Sports Club, Ltd. v. Richmond,* 99 Ill.2d 182, 191, 75 Ill.Dec. 667, 673, 457 N.E.2d 1226, 1232 (Ill. 1983). More specifically, "[u]nder Illinois law, a contract may be found to be unconscionable as a matter of law on either a 'procedural' or 'substantive' basis, or both." *Estate of Davis v. Wells Fargo Bank,* 633 F.3d 529, 535 (7th Cir. 2011); *see also Phoenix Ins. Co. v. Rosen,* 242 Ill.2d 48, 60, 350 Ill.Dec. 847, 949 N.E.2d 639 (Ill. 2011). "Procedural unconscionability refers to a situation in which a term is so difficult to find, read, or understand that the party could not fairly be said to have been aware she was agreeing to it" and "takes into account the party's relative lack of bargaining power." *Estate of Davis,* 633 F.3d at 535; *see also Kinkel v. Cingular Wireless LLC,* 223 Ill.2d 1, 23, 306 Ill.Dec. 157, 857 N.E.2d 250 (Ill. 2006) ("Procedural unconscionability consists of some impropriety during the process of forming the contract depriving a party of a meaningful choice.") (citation omitted). "Factors to be considered in determining whether an

agreement is procedurally unconscionable include whether each party had the opportunity to understand the terms of the contract, whether important terms were 'hidden in a maze of fine print,' and all of the circumstances surrounding the formation of the contract." *Phoenix Ins. Co.,* 242 Ill.2d at 60 (citation omitted). "Substantive unconscionability, on the other hand, refers to contractual terms which are inordinately one-sided in one party's favor." *Estate of Davis,* 633 F.3d at 535; *see also Kinkel,* 223 Ill.2d at 28 ("Substantive unconscionability concerns the actual terms of the contract and examines the relative fairness of the obligations assumed.") (citation omitted).

In his response brief, Cannon first argues that the 1988 Stipulation is unconscionable based on his lack of bargaining power, which falls under procedural unconscionability. *See Estate of Davis,* 633 F.3d at 535; *Razor,* 222 Ill.2d at 99. Under Illinois law, in determining procedural unconscionability, the Court looks to the circumstances surrounding the 1988 Stipulation, whether the parties had a reasonable opportunity to understand the terms of the contract, and whether important terms were hidden. *See Phoenix Ins. Co.,* 242 Ill.2d at 60. Not only was Cannon represented by counsel in the 1986 civil proceedings, it is also undisputed that Cannon testified that he knew when he signed the 1988 Stipulation that he was agreeing to the settlement, that the lawsuit would be ending, and that no one forced him to sign it. (Defs.' Stmt. Facts ¶ 53.) Moreover, in Cannon's January 24, 1988 letter to Lanphier accepting the settlement offer, he stated that despite settling this claim, he knew that Defendant Officers Byrne, Dignan, and Grunhard would continue to torture others. (*Id.* ¶ 48.) Therefore, the record reflects that the settlement was reached knowingly and voluntarily and based on the facts known to Cannon at the time of the settlement. *See McWhite v. Equitable Life Assurance Soc'y*, 141 Ill.App.3d 855,

13

867, 96 Ill.Dec. 105, 490 N.E.2d 1310 (1st Dist. 1986). And, as discussed above, although Cannon may not have known the breadth of the Area 2 officers' misconduct, he and his counsel were certainly aware that other alleged incidents of torture had occurred prior to his 1988 Stipulation and settlement of his excessive force claim. Accordingly, Cannon has not raised a material issue of fact that he had unequal bargaining power under the circumstances. *See Kinkel,* 223 Ill.2d at 24 ("the issue of unconscionability should be examined with reference to all of the circumstances surrounding the transaction"). Even if Cannon had raised a material issue of fact for trial based on the alleged disparity of bargaining power, "Illinois courts have been reluctant to hold that the inequality in bargaining power alone suffices to invalidate an otherwise enforceable agreement." *Melena v. Anheuser-Busch, Inc.,* 219 Ill.2d 135, 153, 301 Ill.Dec. 440, 847 N.E.2d 99 (Ill. 2006).

Cannon also argues that the 1988 Stipulation is unconscionable substantively because the stipulation is completely one-sided, oppressive, and created a manifestly unfair outcome. More specifically, Cannon maintains that settling for $3,000 is disproportionate to the amount of torture he experienced and that other victims of Area 2 torture settled for significantly more money approximately two decades later.[5] Specifically, Cannon states:

> The settlements in the Stanley Howard, Madison Hobley, Aaron Patterson and Leroy Orange torture suits, in which the torture claims were closely analogous to that raised by Plaintiff, indicate that the Stipulation was utterly discordant with the "market value" of Plaintiff's claims and provide potent evidence of substantive unconscionability. Plaintiff's 1988 settlement sum is less by several orders of magnitude than the $1.8 million settlement paid to Stanley Howard in 2003, and it pales still further in comparison to the multi-millions awarded to Patterson, Hobley, and Orange – all of whom settled their torture cases with the

---

[5] *See, e.g., Hobley v. Burge,* No. 03 C 3678, *Patterson v. Burge,* No. 03 C 4433, *Howard v. Chicago,* No. 03 C 8481, and *Orange v. Burge,* No. 04 C 0168.

14

City after the scope of the Burge torture became known.

(R. 426, Sur-Reply, at 5.)

In support of his "market value" argument, Cannon relies upon Illinois cases involving settlements in the context of divorce cases. *See, e.g., In re Marriage of McNeil*, 367 Ill.App.3d 676, 305 Ill.Dec. 483, 856 N.E.2d 15 (2d Dist. 2006); *In re Marriage of Richardson*, 237 Ill.App.3d 1067, 179 Ill.Dec. 224, 606 N.E.2d 56 (1st Dist 1992). Cannon's reliance on Illinois divorce cases is misplaced because they involve the Illinois courts' statutory interpretation of a provision in the Illinois Marriage and Dissolution Act, 750 ILCS 5/502(b), that relates to the parties' economic positions. *See In re Marriage of McNeil,* 367 Ill.App.3d at 684; *In re Marriage of Richardson*, 237 Ill.App.3d at 1080.

In further support of his market value theory, Cannon cites an Illinois case discussing mutual mistake. *See, e.g., Florkiewicz v. Gonzalez,* 38 Ill.App.3d 115, 121, 347 N.E.2d 401, 406 (1st Dist. 1976) ("A significant factor indicating mistake on the part of plaintiff as to the nature of her injuries is the amount of money accepted as consideration for the release.").[6] As the Illinois Appellate Court explains:

> When the circumstances surrounding a settlement clearly indicate that settlement was executed under a mutual mistake of fact, the court may act to prevent an unconscionable hardship to the injured party; among such circumstances are a great discrepancy between the amount of the settlement and the amount of ensuing damages, the exercise of pressure to make the settlement, the superior position of an affluent defendant over a needy plaintiff, and the occurrence of an unforeseen and extraordinary complication in the known injuries.

---

[6] Cannon also cites an Illinois Appellate Court decision from 1977 involving an ambiguity in a general release, namely, whether the release pertained to the plaintiff's property damage and/or personal injuries. *See Gladinus v. Laughlin,* 51 Ill.App.3d 694, 697, 9 Ill.Dec. 173, 176, 366 N.E.2d 430 (1st Dist. 1977). Cannon's reference to the *Gladinus* decision is not helpful to the Court's unconscionability analysis nor to Cannon's market value theory.

15

*Wieneke v. Weitekamp,* 229 Ill.App.3d 520, 524, 170 Ill.Dec. 616, 593 N.E.2d 158 (5th Dist. 1992); *see also Florkiewicz*, 38 Ill.App.3d at 121. Under Illinois law, a mutual mistake of fact exists when a contract has been drafted in terms that violates both parties' true intent and understanding. *See First Health Group Corp. v. Ruddick,* 393 Ill.App.3d 40, 53, 331 Ill.Dec. 971, 911 N.E.2d 1201 (1st Dist. 2009); *United City of Yorkville v. Village of Sugar Grove,* 376 Ill.App.3d 9, 25, 314 Ill.Dec. 896, 875 N.E.2d 1183 (2d Dist. 2007). Here, the parties have not presented any evidence creating an issue of material fact for trial showing that both parties were mutually mistaken as to the terms of the 1988 Stipulation. Thus, under the circumstances, Cannon has not established that the 1988 Stipulation is unenforceable based on mutual mistake.

The Court nevertheless turns to Cannon's unconscionability argument based on the settlement amounts in *Hobley*, *Orange*, *Patterson*, and *Howard* cases. Although an "unconscionability determination is not restricted to the facts and circumstances in existence at the time the contract was entered into," *see Razor*, 222 Ill.2d at 97, comparing subsequent settlement amounts from similar, but different lawsuits in which the parties settled approximately twenty years after the 1988 Stipulation would run counter to Illinois public policy of encouraging the finality of settlements. *See In re Tammy D.,* 339 Ill.App.3d 419, 423, 274 Ill.Dec. 34, 790 N.E.2d 410 (5th Dist. 2003) ("The public policy of Illinois favors settlements in civil cases, and settlements, once made, should be final."); *see also Brown v. City of Aurora,* 955 F.Supp. 1023, 1025 (N.D. Ill. 1997) ("Merely because [plaintiff] now believes, in hindsight, that her case was worth more than $15,000 is not a sufficient basis to disregard the agreement entered into by the parties"); *Cf. Freedman v. Air Line Stewards & Stewardesses Assoc., Local 550, TWU, AFL-CIO,* 730 F.2d 509, 515-16 (7th Cir. 1984) ("That one party in hindsight would have

been better off in pursuing its remedies through litigation does not now justify a modification of the terms of that settlement. Such a modification at this juncture and under these circumstances would also significantly undermine the judicial policy of encouraging settlements"). As the Illinois Appellate Court explained in the context of a worker's compensation legal malpractice claim, "[s]ubsequent or concurrent developments in the law would always operate to provide the dissatisfied party a ground to revisit an agreement, which at the time was satisfactory but in retrospect became burdensome or undesirable. Such a result would run counter to the public policy of this State." *Cameron v. Bogusz,* 305 Ill.App.3d 267, 274, 238 Ill.Dec. 533, 711 N.E.2d 1194 (1st Dist. 1999). Likewise, revisiting the terms of the 1988 Stipulation based on the subsequent, higher settlement amounts in similar cases from over twenty years later not only goes against public policy, but would open the flood gates of dissatisfied litigants filing lawsuits to void settlement agreements.

As discussed in detail above, Cannon was aware of the facts of his own excessive force case, as well as other allegations of abuse and torture at Area 2. He also testified at his October 11, 2010 deposition that he was with the victim, Darrin Ross, on the day of Ross' murder, that he was driving the car when Ross was shot and killed, and that he helped another person dispose of Ross' body. (R. 436-1, Ex. K, Cannon Dep., at 20, 174, 223-30.) Cannon also knew of his own gang affiliations at the time he entered into the 1988 Stipulation, (*see id.* at 36), and that he had prior criminal convictions. In addition, in his 1986 complaint, Cannon sought $15,000 in damages. Under these circumstances, the Court would be hard-pressed to conclude that the 1988 Stipulation was unconscionable based on the $3,000 settlement – relative to his initial request of $15,000 – because Cannon was aware of the shortcomings of his case, the facts surrounding his

claims, was represented by counsel, and knowingly and voluntarily entered into the 1988 Stipulation. *See, e.g., Bullock v. O'Hara,* No. 95 C 4641, 1996 WL 495560, at *2 (N.D. Ill. Aug. 27, 1996).

The Court acknowledges that Cannon spent approximately twenty-three years in prison before his criminal charges were dismissed. Also, the Court recognizes the offensive, unacceptable systemic police torture that has occurred in Chicago as outlined by the 2006 Special Prosecutor's Report and the resultant federal investigation and prosecution and conviction of Burge. Nevertheless, under the circumstances, the Court is not in the position to extend Illinois contract law to allow Cannon's lawsuit against the City of Defendants given that Cannon already settled with the City Defendants in 1988.

On a final note, because the Court concludes that Cannon has failed to establish a genuine dispute as to any material fact concerning his fraudulent concealment and unconscionability arguments, the Court need not address the City Defendants' ratification and statute of limitations arguments.

## CONCLUSION

For the foregoing reasons, the Court grants the City Defendants' Motion for Summary Judgment brought pursuant to Federal Rule of Civil Procedure 56(b). The Court denies Defendants' motion to strike the declaration of Flint Taylor as moot.

**Date:** September 19, 2011

**ENTERED**

*[signature]*

**AMY J. ST. EVE**
**United States District Court Judge**